SEALED FILED

Case 2:17-sw-00367-CKD   Document 1   Filed 05/15/17   Page 1 of 21

MAY 15 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

AO 106 (Rev. 12/03)  Affidavit for Search Warrant

# United States District Court

| | |
|---|---|
| **EASTERN**       District of       **CALIFORNIA** | |

| In the Matter of the Search of | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT** |
|---|---|

(Name, address or brief description of person, property or premises to be searched)

THE CELLULAR TELEPHONES ASSIGNED CALL NUMBERS 916-291-0053, 916-549-8121, and 916-869-5828

CASE NUMBER:

**2:17 - SW - 0 3 6 7 — - CKD**

I, Maxim Lashchuk, being duly sworn depose and say:

I am a(n) <u>DEA Special Agent</u> and have reason to believe that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

THE CELLULAR TELEPHONES ASSIGNED CALL NUMBERS 916-291-0053, 916-549-8121, and 916-869-5828,

in the     **EASTERN**     District of     **CALIFORNIA**
there is now concealed a certain person or property, namely  (describe the person or property to be seized)

**SEE ATTACHMENT B, attached here and incorporated by reference**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of THE Federal Rules of Criminal Procedure)

**property that constitutes evidence, fruits, and/or instrumentality of a criminal offense**

concerning a violation of Title <u>21</u> United States Code, Section(s) <u>846, 841(a)(1)</u>.

The facts to support a finding of probable cause are as follows:

**SEE AFFIDAVIT, attached here and incorporated by reference**

Continued on the attached sheet and made a part hereof.      ☒ Yes ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

5/15/2017
Date

at   Sacramento, California
     City     State

_____
Carolyn K. Delaney, U.S. Magistrate Judge        Signature of Judge

1  PHILLIP A. TALBERT
   United States Attorney
2  PAUL HEMESATH
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2932
   Facsimile: (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8                 IN THE UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

| In the Matter of the Search of: | CASE NO. |
|---|---|
| THE CELLULAR TELEPHONES ASSIGNED CALL NUMBERS 916-291-0053, 916-549-8121, and 916-869-5828 | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO OBTAIN PRECISE LOCATION DATA FROM CELLULAR TELEPHONES **UNDER SEAL** |

16

I, Maxim Lashchuk, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers **916-291-0053, 916-549-8121, and 916-869-5828** (the "Target Cell Phones"). The wireless telephone service provider for **916-291-0053, 916-549-8121, and 916-869-5828** are AT&T, Sprint, and Sprint respectively. The Target Cell Phones described in this Affidavit and in Attachment A, and the location information to be seized is described in this affidavit and in Attachment B.

2.      I am a Special Agent (SA) of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been employed with the DEA since 2014.  Upon being hired by the DEA, I completed approximately five months of DEA Basic Agent training at the DEA Training

AFFIDAVIT                                                    1

1  Academy in Quantico, Virginia, where I received specialized training in narcotic investigation matters to
2  include but not limited to training in drug identification, drug trafficking trends and methods, evidence
3  gathering, report writing, money laundering, asset forfeiture, undercover operations, physical and
4  electronic surveillance operations, and confidential source management and debriefings. After
5  completing Basic Agent training, I was assigned to my current assignment at the DEA Sacramento
6  District Office, Task Force Group.

7         3.      During the course of my employment with the DEA, I have participated in and/or led
8  investigations targeting individuals involved in trafficking of heroin, methamphetamine, cocaine, crack
9  cocaine, LSD, marijuana, steroids, and prescription drugs.  Through my training, experience, and
10 interaction with other experienced Special Agents, I have encountered and become familiar with various
11 tools, methods, trends, paraphernalia, and related articles used by drug traffickers and drug trafficking
12 organizations in their efforts to import, store, conceal, transport, manufacture, and distribute controlled
13 substances.  The conclusions and opinions set forth below are based on my experience and training as a
14 DEA Special Agent, and conversations I had with other law enforcement officers who are familiar with
15 the facts and circumstances of this investigation.

16        4.      This affidavit is intended to show only that there is sufficient probable cause for the
17 requested warrant and does not set forth all of my knowledge about this matter.

18        5.      Based on the facts set forth in this affidavit, there is probable cause to believe that
19 violations of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and possess with intent to
20 distribute heroin have been committed, are being committed, and will be committed by Ibis Alberto
21 LUIS-FLORES, Richard Garnica TORRES, Steven Christopher SACHAROW, and other unknown co-
22 conspirators.  There is also probable cause to believe that the location information described in
23 Attachment B will constitute evidence of these criminal violations and will help agents locate and
24 identify individuals who are engaged in the commission of these offenses and any drug stash locations
25 they utilize.

26                        **II.      PROBABLE CAUSE**

27
28        6.      Beginning in mid-2015, I began an investigation of a heroin and methamphetamine drug

1  trafficking organization ("LUIS-FLORES DTO") headed by Ibis Alberto LUIS-FLORES who I

2  suspected of distributing narcotics for the Sinaloa Cartel throughout northern California and shipping

3  narcotics to other states. I learned of the LUIS-FLORES DTO after arresting one of LUIS-FLORES'

4  sub-distributors and criminal associates in July of 2015 and seizing approximately a pound of heroin and

5  a pound of methamphetamine, a hand gun, a bullet proof vest, and approximately $64,000 in drug

6  proceeds.  I learned that LUIS-FLORES had no legal standing in the United States and that he used

7  multiple aliases, fraudulent Social Security numbers, provided false telephone subscriber information,

8  and drove vehicles either without license plates or vehicles registered to someone else, all in an effort

9  which I believed was to conceal his true identity and avoid detection by law enforcement.

10       7.       After making inquiries with state and federal databases, I was unable to locate any

11  documented criminal history of LUIS-FLORES. However, since the beginning of this investigation,

12  DEA Intelligence Research Specialist (IRS) Matthew Kregor identified multiple cellphone numbers

13  which were used by LUIS-FLORES. Phone toll analysis of LUIS-FLORES' phone numbers, revealed

14  that LUIS-FLORES was in regular contact with multiple known drug traffickers throughout the United

15  States to include those who were recently arrested for trafficking heroin and methamphetamine. I also

16  observed that LUIS-FLORES was in telephone contact with several phone numbers used by targets

17  suspected of importing large quantities of heroin and methamphetamine into the United States from

18  Mexico.

19       8.       In late 2015, I identified Richard Garnica TORRES as a drug runner for the LUIS-

20  FLORES' DTO.  I made inquiries with the National Crime Information Center ("NCIC") and learned

21  that in 2013 TORRES was arrested for Alien Smuggling. Also in 2014, TORRES was arrested for

22  felony Possession of Methamphetamine which is still pending adjudication. Phone toll analysis of

23  FLORES' numerous identified telephones showed that TORRES continued to be the top contact of

24  FLORES. Phone tolls showed that both FLORES and TORRES regularly changed their phone numbers

25  (approximately every 1-2 months) which based on my training and experience is common among drug

26  traffickers in an effort to avoid detection and interception by law enforcement.

27       **Identification of LUIS-FLORES' Sub-distributor Steven SACHAROW**

28       9.       Phone toll analysis of LUIS-FLORES' multiple identified phone numbers suggested that

1  Steven C. SACHAROW was a sub-distributor for LUIS-FLORES based on SACHAROW's drug

2  trafficking history and the regular telephone contact he had with LUIS-FLORES. I made inquiries with

3  the National Crime Information Center (NCIC) and learned that SACHAROW had an extensive

4  criminal record dating back to 1999 which included two misdemeanor convictions for Transport of a

5  Controlled Substance in 2009 and 2010, and one felony conviction in 2011 for Transport of a Controlled

6  Substance resulting in a two year prison sentence.

7       10.    In May of 2016, DEA Special Agent Brian Nehring, acting in an undercover capacity,

8  was introduced to SACHAROW who provided a telephone number of **916-869-5828** where he

9  (SACHAROW) could be reached for any future heroin or methamphetamine deals. On June 2, 2016,

10  Special Agent Nehring met with SACHAROW in Sacramento, California, and purchased two ounces of

11  heroin.  Prior to this meeting, during a phone call with Special Agent Nehring, SACHAROW stated that

12  he would call his source of supply ("SOS") to arrange for the heroin to be delivered. Phone tolls showed

13  that after the conversation with Special Agent Nehring, SACHAROW immediately called **916-698-**

14  **1181**, a phone number identified by IRS Kregor to be used by LUIS-FLORES during that time period.

15  Minutes later, I observed LUIS-FLORES arrive to SACHAROW's residence (4134 Vicksburg Lane,

16  Sacramento, California). After talking to SACHAROW for several minutes LUIS-FLORES departed.

17  Phone tolls showed that upon departure, LUIS-FLORES called 916-500-3379, a phone number

18  identified by IRS Kregor to be used at that time by LUIS-FLORES' drug runner TORRES.

19       11.    Shortly before the meeting with Special Agent Nehring, SACHAROW called Special

20  Agent Nehring and stated that he had just called his guy (i.e. SOS) to find out how far away the heroin

21  was and the SOS stated that he was minutes away. Phone tolls showed that before calling Special Agent

22  Nehring, SACHAROW made an outgoing call to TORRES. Moments later, surveillance observed

23  TORRES arrive to SACHAROW's residence on a Honda Pilot which I consistently observed parked at

24  LUIS-FLORES' residence (1570 Baines Ave, Sacramento, CA). TORRES walked towards

25  SACHAROW's residence and approximately two minutes later returned to the Honda and drove away.

26  Then SACHAROW exited his residence and drove out to the meet location where SACHAROW sold

27  Special Agent Nehring the two ounces of heroin. Based on the aforementioned chain of events, I believe

28  that SACHAROW initially contacted his SOS (LUIS-FLORES) requesting the two ounces of heroin.

1  After meeting with SACHAROW, LUIS-FLORES sent his drug runner TORRES to make the delivery

2  to SACHAROW which was observed by surveillance.

3  **July 2016 Undercover Deal with SACHAROW**

4  12.   On July 12, 2016, Special Agent Nehring again met with SACHAROW and purchased

5  two ounces of heroin. Prior to this meeting, SACHAROW told Special Agent Nehring that he would call

6  his SOS to have the heroin delivered. At this time, phone tolls showed that SACHAROW contacted

7  LUIS-FLORES at 415-308-1545, a telephone number identified by IRS Kregor to be used by LUIS-

8  FLORES during that time period. Shortly later, surveillance observed TORRES arrive and meet with

9  LUIS-FLORES at LUIS-FLORES' residence and then approximately an ninety minutes later TORRES

10  drove away in a white Ford Transit van. Approximately forty minutes later, surveillance observed

11  TORRES arrive on the Ford van to SACHAROW's residence, walk towards the residence, and

12  approximately two minutes later return and drive away. At this time, Special Agent Nehring called

13  SACHAROW who stated that the heroin was just delivered and that he will be meeting Special Agent

14  Nehring shortly. Moments later SACHAROW left his residence and drove to the meet location where he

15  sold two ounces of heroin to Special Agent Nehring.

16  13.   Surveillance followed TORRES away from SACHAROW's residence to a gas station

17  near LUIS-FLORES's residence where TORRES met briefly with LUIS-FLORES by the pumps. After

18  the meeting, LUIS-FLORES drove away on a separate vehicle and TORRES returned to LUIS-

19  FLORES' residence and walked inside. The chain of events that unfolded during this undercover drug

20  deal, led me to believe that LUIS-FLORES was supplying SACHAROW with the heroin and that

21  TORRES was a drug runner working at the direction of LUIS-FLORES. I believe that TORRES

22  delivered the heroin to SACHAROW immediately prior to SACHAROW's meeting with Special Agent

23  Nehring. Then TORRES met with LUIS-FLORES at the gas station where I believe TORRES gave

24  LUIS-FLORES the money generated from the sale of the heroin.

25  **Identification of LUIS-FLORES' Suspected Drug Stash Location**

26  14.   On October 20, 2016, I obtained a federal search warrant (2:16-SW-627 KJN) authorized

27  by Honorable U.S. Magistrate Judge Kendall J. Newman for the GPS Location Data (pings) of LUIS-

28  FLORES' 530-312-7575 cellphone number. Upon activation, during the night hours, 530-312-7575

1  pinged to LUIS-FLORES's residence. I conducted surveillance and observed LUIS-FLORES alone in a

2  vehicle where the pings were showing 530-312-7575 to be. This confirmed that LUIS-FLORES was

3  carrying and using cellphone 530-312-7575 as I had suspected.

4       15.    On the night of October 28, 2016, pings showed that LUIS-FLORES traveled by a

5  vehicle down south to San Juan Capistrano, California. Prior to leaving Sacramento, LUIS-FLORES

6  stopped by a garage on 1601 Juliesse Ave, Sacramento, California. While in San Juan Capistrano,

7  California, LUIS-FLORES went to a park, a movie theater, spent a lot of time in various parking lots,

8  and visited a Best Western Inn but never stayed the night. That same night, pings showed that LUIS-

9  FLORES travelled back to Sacramento.

10       16.    On the morning of October 29, 2016, when LUIS-FLORES returned to Sacramento,

11  pings showed that LUIS-FLORES did not go directly to his residence but stopped by several addresses

12  of known drug traffickers, to include the address of SACHAROW from whom Special Agent Nehring

13  made multiple undercover heroin purchases. LUIS-FLORES then stopped by the garage on 1601

14  Juliesse Ave, Sacramento, California before eventually heading back to his residence. Based on the

15  aforementioned facts regarding LUIS-FLORES' trip to San Juan Capistrano, I believe that this trip was

16  drug related. I believe LUIS-FLORES met his SOS in San Juan Capistrano to pick up narcotics and

17  upon arrival to Sacramento, LUIS-FLORES stopped by the residences of his drug distributors to drop

18  off the narcotics. I therefore suspected that LUIS-FLORES was using the garages located at 1601

19  Juliesse Ave, Sacramento, California as a drug stash location. During the next several weeks I observed

20  LUIS-FLORES's phone frequently ping to the drug stash and then travel to various parking lots where I

21  suspect that LUIS-FLORES met with his drug customers to conduct drug deals. Pings showed that

22  shortly later LUIS-FLORES would return back to the drug stash before going home.

23                   **December 2016 Undercover Deal with SACHAROW**

24       17.    On November 22, 2016, I obtained a federal search warrant (2:16-SW-0737 DB)

25  authorized by Honorable U.S. Magistrate Judge Deborah Barnes for the pings of LUIS-FLORES' 530-

26  312-7575 cellphone number. On December 12, 2016, Special Agent Nehring contacted SACHAROW

27  and arranged for a meeting the following day where SACHAROW would sell 3-4 ounces of heroin to

28  Special Agent Nehring. SACHAROW stated that he just talked to his SOS and that his SOS was on his

1  way to deliver the heroin to SACHAROW. At this time I checked the pings for LUIS-FLORES's phone

2  and observed that LUIS-FLORES was moving in the direction of SACHAROW's residence and tolls

3  confirmed that SACHAROW talked to LUIS-FLORES immediately before he called Special Agent

4  Nehring. I drove out to SACHAROW's residence and observed LUIS-FLORES arrive to

5  SACHAROW's residence only to leave minutes later. I believe that at this time LUIS-FLORES

6  delivered the heroin to SACHAROW.

7       18.    The next day, on December 13, 2016, Special Agent Nehring contacted SACHAROW

8  and stated that he was arriving to the agreed upon public meet location to purchase the three ounces of

9  heroin. SACHAROW told Special Agent Nehring that he already had four ounces of heroin and didn't

10  have to wait for his SOS to deliver it. After SACHAROW sold the three ounces of heroin to Special

11  Agent Nehring, SACHAROW drove to his residence and tolls showed that he immediately contacted

12  LUIS-FLORES. I believe that SACHAROW was letting LUIS-FLORES know that the money generated

13  from the heroin deal with Special Agent Nehring was ready and that LUIS-FLORES could stop by to

14  collect the money.

15       19.    I continued to monitor the pings for LUIS-FLORES' phone in anticipation that LUIS-

16  FLORES would arrive to SACHAROW's residence to collect the money. Later that evening, pings

17  showed that LUIS-FLORES was headed towards SACHAROW's residence and eventually the pings

18  placed LUIS-FLORES directly at SACHAROW's residence. I drove out to SACHAROW's residence

19  and observed LUIS-FLORES departing the mobile home park where SACHAROW resides. Based on

20  the above described facts and the fact that LUIS-FLORES spent only approximately five minutes at

21  SACHAROW's residence, I believe that the purpose of this trip was for LUIS-FLORES to collect the

22  money from SACHAROW. I subsequently followed LUIS-FLORES directly back to the suspected drug

23  stash location, where LUIS-FLORES spent approximately fifteen minutes before going home.

24                 **February, 2017 Undercover Deal with SACHAROW**

25       20.    On February 2, 2017, I obtained a federal search warrant (2:17-SW-0089 KJN)

26  authorized by Honorable U.S. Magistrate Judge Kendall J. Newman for the pings of LUIS-FLORES'

27  657-340-0399 cellphone number. Pings showed that 657-340-0399 spent the night hours at LUIS-

28  FLORES's residence and through surveillance I confirmed that LUIS-FLORES was carrying 657-340-

1  0399. On February 5, 2017, Special Agent Nehring contacted SACHAROW and ordered four ounces of

2  heroin. SACHAROW stated that he would be able to conduct the drug deal in the next few days. Tolls

3  showed that SACHAROW subsequently contacted LUIS-FLORES at the 657-340-0399 number.

4        21.    On the night of February 6th, 2017, pings showed that LUIS-FLORES travelled by a

5  vehicle to Commerce, California. On the morning of February 7th, 2017, pings placed LUIS-FLORES in

6  a hotel for five hours. I subsequently submitted an administrative subpoena to that hotel and records

7  showed that on the morning of February 7th, 2017, LUIS-FLORES checked into a room using his alias

8  name of "Roberto LUIS", his old address of 440 Wilson Ave, Sacramento, California, and his wife's

9  phone number with only one digit off. Pings showed that LUIS-FLORES departed back to Sacramento

10  early that afternoon and tolls showed that he was in contact with SACHAROW immediately after

11  leaving Commerce, California. Special Agent Nehring contacted SACHAROW around that time and

12  SACHAROW stated that his SOS would be back in town after 7 p.m. That same evening, at 7 p.m., I

13  observed LUIS-FLORES returned to Sacramento, arriving directly to the suspected drug stash location.

14  Approximately two hours later I witnessed LUIS-FLORES leave the drug stash location and arrive to

15  SACHAROW's residence where he spent approximately thirty minutes. While LUIS-FLORES was at

16  SACHAROW's residence, Special Agent Nehring contacted SACHAROW who stated that he had

17  received the heroin and was ready to conduct the drug deal whenever Special Agent Nehring was ready.

18        22.    On February 9th, 2017, Special Agent Nehring met with SACHAROW and purchased the

19  four ounces of heroin. After the drug deal, SACHAROW travelled directly to his residence and tolls

20  showed that he contacted LUIS-FLORES. I believe that SACHAROW was letting LUIS-FLORES know

21  that the heroin deal with Special Agent Nehring was completed and the money was ready to be

22  collected. For the next three hours surveillance did not see any arrivals to SACHAROW's residence.

23  Then tolls showed that LUIS-FLORES placed an outgoing call to SACHAROW and pings showed that

24  LUIS-FLORES left the drug stash location and traveled to SACHAROW's residence. I drove by

25  SACHAROW's residence and observed LUIS-FLORES walk from SACHAROW's residence, enter into

26  his vehicle and drive away, arriving back to the drug stash location. I believe that during this quick visit

27  to SACHAROW's residence, LUIS-FLORES had collected the money generated from the heroin deal.

28

**March, 2017 Undercover Deal with SACHAROW**

23.     On March 7th, 2017, I obtained a federal ping order (2:17-SW-0193 CKD) for LUIS-FLORES' 650-445-8166 phone number as authorized by Honorable U.S. Magistrate Judge Carolyn K. Delaney. I conducted surveillance of 650-445-8166 and confirmed that LUIS-FLORES was carrying and using 650-445-8166.

24.     On the evening of March 13th, 2017, Special Agent Nehring called SACHAROW on SACHAROW's 916-869-5828 phone number and arranged to purchase a pound of crystal methamphetamine. SACHAROW stated that he will make the arrangements and have the methamphetamine ready.

25.     On the morning of March 14th, 2017, tolls showed that SACHAROW placed a short call to LUIS-FLORES at 650-445-8166 and approximately forty minutes later pings showed that LUIS-FLORES arrived to SACHAROW's residence. I believe that at this time SACHAROW discussed with LUIS-FLORES regarding the availability of a pound of methamphetamine. From SACHAROW's residence pings showed that LUIS-FLORES travelled to the drug stash location.

26.     On March 15th, 2017, Special Agent Nehring met with SACHAROW and purchased a pound of methamphetamine. During this drug transaction, SACHAROW told Special Agent Nehring that he was unable to obtain the methamphetamine from his "Paisa" (e.g. his Hispanic SOS); because the "Paisa" was out of methamphetamine until approximately next Monday (3-20-2017) but still had a lot of heroin left. Therefore, SACHAROW stated that he had to obtain the methamphetamine from an alternate SOS.

27.     On the late evening of March 19th, 2017, pings showed that LUIS-FLORES arrived briefly to the drug stash location. At this time, I observed a lifted pickup truck arrive and the driver, tentatively matching the description of LUIS-FLORES, exited and walked towards the second northern most garage. Minutes later, LUIS-FLORES walked from the garage, entered the pickup truck and departed. Several minutes later, pings placed LUIS-FLORES next to SACHAROW's residence. The phone pinged near SACHAROW's residence for approximately fifteen minutes before returning back to the drug stash location. I observed the same lifted pickup truck arrive to the drug stash location and the driver walked towards the second northern most garage. LUIS-FLORES spent approximately fifteen

1  minutes at the drug stash location and then left to his residence. Based on LUIS-FLORES' brief stop at

2  the suspected drug stash location, before and after visiting SACHAROW's residence, and the fact that

3  SACHAROW told Special Agent Nehring that his "Paisa" SOS will have the methamphetamine

4  available on approximately March 20, 2017, I believed that during this visit to SACHAROW, LUIS-

5  FLORES supplied SACHAROW with methamphetamine.

6  **April 2017 Undercover Deal with SACHAROW**

7      28.     On April 19th, 2017, I obtained a federal ping order (2:17-SW-0282 AC), authorized by

8  Honorable U.S. Magistrate Judge Allison Claire, for LUIS-FLORES' 415-987-6985 and

9  SACHAROW's **916-869-5828** phone numbers. I conducted surveillance of the 415-987-6985 pings and

10 confirmed that LUIS-FLORES was carrying the 415-987-6985 phone number.

11     29.     On the evening of April 26th, 2017, Special Agent Nehring contacted SACHAROW at

12 916-869-5828 and agreed to meet with SACHAROW around noon on April 27th, 2017 to purchase two

13 ounces of heroin and a half pound of methamphetamine. SACHAROW stated that he was getting a

14 pound of methamphetamine that evening from his "Paisa" SOS and that he would hang-up the phone

15 after this conversation with Special Agent Nehring and immediately call the SOS and get extra heroin

16 and methamphetamine for Special Agent Nehring. Tolls showed that immediately after hanging up,

17 SACHAROW contacted LUIS-FLORES at 415-987-6985 and then called him again at 7:02 p.m. I

18 monitored the pings for LUIS-FLORES' 415-987-6985 number and observed that at 7:58 p.m., LUIS-

19 FLORES left his residence and travelled to the suspected drug stash location where I observed LUIS-

20 FLORES arrive on a white Ford Transit van and enter the northern most garage. After approximately ten

21 minutes LUIS-FLORES returned from the northern most garage, opened the rear door of the Ford van,

22 and appeared to have placed something inside. Then LUIS-FLORES entered the driver's door and

23 departed on the Ford. Pings showed that from the drug stash location LUIS-FLORES drove to his

24 residence. I monitored the pings of both SACHAROW's and LUIS-FLORES' phones and did not

25 observe them meet that evening.

26     30.     On the early morning of April 27th, 2017, tolls showed that SACHAROW contacted

27 LUIS-FLORES at 415-987-6985 and then at 9:35 a.m. LUIS-FLORES' phone pinged directly in front of

28 SACHAROW's residence. LUIS-FLORES spent only several minutes at SACHAROW's residence

1 | because the next ping showed that LUIS-FLORES had already left that location and approximately

2 | thirty minutes later arrived to the drug stash location on the Ford Transit van. I believe that on the

3 | evening of April 26th, 2017 after talking to SACHAROW, LUIS-FLORES travelled to the drug stash

4 | location to pick up the heroin and methamphetamine. Then LUIS-FLORES stored the narcotics

5 | overnight at his residence or in the Ford van parked at his residence, because on the morning of April

6 | 27th, 2017, LUIS-FLORES travelled directly to SACHAROW's residence.

7 |     31.    At approximately 11:39 a.m., SACHAROW contacted Special Agent Nehring and stated

8 | that he was ready to conduct the drug deal. Surveillance was established at SACHAROW's residence

9 | and agents witnessed a vehicle arrive with two WMAs onboard and leave several minutes later. The

10 | driver was identified, and after making inquiries with NCIC I learned that he was previously arrested for

11 | Possession of a Controlled Substance and Paraphernalia. Therefore, I believe that his was one of

12 | SACHAROW's drug customers who stopped by to purchase narcotics from SACHAROW.

13 |     32.    Once Special Agent Nehring arrived to the agreed meet location, surveillance witnessed

14 | SACHAROW leave his residence and meet with Special Agent Nehring where SACHAROW sold 79.5

15 | gross grams of heroin and 256.5 gross grams of methamphetamine. SACHAROW told Special Agent

16 | Nehring that his "Paisa" SOS wanted to deal in "weight" and that the prices would go down if larger

17 | amounts were purchased. It should be noted that during all of the previous surveillances, agents never

18 | observed any other Hispanic nationals arrive to SACHAROW's residence besides LUIS-FLORES, his

19 | unidentified Hispanic passengers, and his drug runner TORRES. All other arrivals were white subjects.

20 | SACHAROW stated that his "Paisa" SOS could provide a kilogram of heroin for $48,000 which was of

21 | very good quality and could be adulterated into twice as much (e.g., one kilogram could be mixed into

22 | two sellable kilograms). SACHAROW stated that his "Paisa" SOS gets 100 pounds of

23 | methamphetamine at a time from Mexico and "ships it over here." SACHAROW stated that his SOS

24 | "fronts" pound quantities of methamphetamine to SACHAROW (i.e. gives the narcotics to

25 | SACHAROW without asking for payment and only collects the money after the narcotics are sold).

26 | During this drug deal, Special Agent Nehring discussed with SACHAROW the next drug deal of

27 | approximately half a pound of heroin and several pounds of methamphetamine. SACHAROW stated

28 | that he would talk to his SOS, get the prices, and arrange the next drug deal.

1        33.    After the drug deal, surveillance followed SACHAROW back to his residence.

2  Continuous surveillance was maintained of SACHAROW and agents witnessed SACHAROW leave his

3  residence and make brief stops at several addresses. I believe that SACHAROW was delivering

4  narcotics to his drug customers during these brief stops.

5        34.    Then at 3:14 p.m., tolls showed that LUIS-FLORES contacted SACHAROW.

6  Surveillance observed SACHAROW return to his residence at approximately 4:16 p.m. and at 4:20 p.m.

7  and tolls showed that SACHAROW contacted LUIS-FLORES. I believe that at this time, SACHAROW

8  finished his drug deals with other customers and was letting LUIS-FLORES know that the money

9  generated from the drug deals was ready to be collected.

10        35.    At approximately 5:22 p.m., pings showed that LUIS-FLORES left his residence and

11  travelled directly to SACHAROW's residence. I observed LUIS-FLORES arrive on the Ford Transit van

12  and park next to SACHAROW's residence. Several minutes later LUIS-FLORES' phone pinged in front

13  of SACHAROW's residence. I then drove by and observed LUIS-FLORES next to the entrance of

14  SACHAROW's residence. Approximately ten minutes later, I observed LUIS-FLORES depart

15  SACHAROW's residence on the Ford van. I believe that during this brief visit LUIS-FLORES collected

16  the money generated from the drug deals conducted by SACHAROW.

17        **Identification of LUIS-FLORES' New Cellphone**

18        36.    On May 6th, 2017, the court authorized pings for LUIS-FLORES' 415-987-6985 phone

19  stopped pinging. I noticed that a month has elapsed since LUIS-FLORES activated this phone on April

20  6, 2017. On May 11th, 2017, IRS Kregor analyzed the tolls of LUIS-FLORES' 415-987-6985 phone, and

21  observed that on the days leading up to May 6, 2017, LUIS-FLORES stopped using the 415-987-6985

22  number. Beginning on May 9th, 2017, SACHAROW and many of LUIS-FLORES' top contacts began

23  communicating with a new mutual **916-549-8121** phone number.  Sprint records revealed that **916-549-**

24  **8121** was a pre-paid Sprint phone number subscribed to "Carlos SANCHEZ" with no address

25  provided. The **916-549-8121** phone number was activated on April 21, 2017 and slowly started to pick

26  up call activity. Previously, LUIS-FLORES provided fictitious subscriber information on most of his

27  other identified phone numbers.

28        37.    Further, IRS Kregor performed a common call toll analysis for the new **916-549-8121**

1  phone number and observed that during the first few days of activation, **916-549-8121** was in contact

2  with five of the same top contacts as LUIS-FLORES' last known phone number. SACHAROW and

3  several other top contacts of LUIS-FLORES' previous phone number remained to be the top contacts on

4  LUIS-FLORES' suspected new **916-549-8121** phone number and shared similar call frequencies as on

5  the previous number. Therefore, I believe that **916-549-8121** is LUIS-FLORES' new number which he

6  recently obtained to avoid detection and interception by law enforcement and that **916-549-8121** is the

7  number which LUIS-FLORES currently uses to facilitate his drug trafficking activities.

8  **Identification of TORRES' New Cellphone**

9         38.     During surveillance of the drug stash location and LUIS-FLORES' residence, I continued

10  to observe TORRES and LUIS-FLORES together, which led me to believe that TORRES was still a

11  drug runner working for LUIS-FLORES. Tolls of TORRES' previously identified phone numbers

12  showed that he continued to communicate with some of the same telephone contacts that LUIS-

13  FLORES was in contact with, many of whom were identified drug dealers. IRS Kregor noted that

14  beginning on May 10th, 2017, SACHAROW (who never changed his **916-869-5828** phone number since

15  the beginning of this investigation and tolls show that **916-869-5828** is still active) was in contact with a

16  new **916-291-0053**, AT&T prepaid phone number, subscribed to "Rich GARCIA" with a fictitious

17  Sacramento address. In the past, TORRES (whose full name is Richard Garnica TORRES) used the alias

18  of "Rich GARCIA" when providing the subscriber information for at least one of his phones. Further,

19  IRS Kregor noted that **916-291-0053** communicated with many of the same contacts that LUIS-

20  FLORES communicated with. Also, tolls for **916-291-0053** show that call activity began on May 8th,

21  2017 which is in close proximity of the date LUIS-FLORES' previous phone number expired (May 6th,

22  2017) and the date LUIS-FLORES began using the new **916-549-8121** phone number to communicate

23  with SACHAROW and other top drug contacts (May 9th, 2017). Therefore I believe that both TORRES

24  and LUIS-FLORES agreed to change their phone numbers around the same time period. The fact that

25  LUIS-FLORES contacted SACHAROW first, on the May 9th, 2017 and that TORRES was in contact

26  with SACHAROW later on May 10th, 2017, lead me to believe that LUIS-FLORES is still directing

27  TORRES to make deliveries of heroin and methamphetamine to SACHAROW as it was observed by

28  surveillance during previous drug deals.

1  39. I believe that the telephone GPS locator data available from AT&T and Sprint for **916-**

2 **549-8121** (suspected to be used by LUIS-FLORES), **916-869-5828** (used by SACHAROW), and **916-**

3 **291-0053** (suspected to be used by TORRES) will assist DEA agents in conducting physical surveillance

4 on LUIS-FLORES, SACHAROW, and TORRES, help identify any co-conspirators, help identify any

5 assets used by LUIS-FLORES' DTO in the furtherance of drug trafficking, and help locate LUIS-

6 FLORES, SACHAROW, and TORRES during the next buy/bust operation resulting in their arrest and

7 prosecution.

8  40. In my training, experience, and the conversations I had with more experienced DEA

9 agents, I have learned that AT&T and Sprint are companies that provides cellular telephone access to the

10 general public. I also know that providers of cellular telephone service have technical capabilities that

11 allow them to collect and generate at least two kinds of information about the locations of the cellular

12 telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-

13 longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector

14 records. E-911 Phase II data provides relatively precise location information about the cellular

15 telephone itself, either via GPS tracking technology built into the phone or by triangulating on the

16 device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell

17 towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the

18 cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

19 connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more

20 miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve

21 every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911

22 Phase II data.

23  41. Based on my training and experience, I know that AT&T and Sprint and Sprint can

24 collect E-911 Phase II data about the location of the Target Cell Phones, including by initiating a signal

25 to determine the location of the Target Cell Phones on AT&T and Sprint and Sprint's network or with

26 such other reference points as may be reasonably available.

27  42. Based on my training and experience, I know that AT&T and Sprint and Sprint can

28 collect cell-site data about the Target Cell Phones.

### III.     AUTHORIZATION REQUEST

43.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

44.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

45.     I further request that the Court direct AT&T and Sprint and Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T and Sprint and Sprint.  I also request that the Court direct AT&T and Sprint and Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T and Sprint and Sprint's services, including by initiating a signal to determine the location of the Target Cell Phones on AT&T and Sprint and Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate AT&T and Sprint and Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

46.     I further request that the Court authorize execution of the warrant at any time of day or

AFFIDAVIT                                           15

1  night, owing to the potential need to locate the Target Cell Phones outside of daytime hours.

2       47.      **REQUEST FOR SEALING:** I further request that the Court order that all papers in

3  support of this application, including the affidavit and search warrant, be sealed until further order of the

4  Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to

5  all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because

6  their premature disclosure may seriously jeopardize that investigation.

7

8

9                                                   Maxim Lashchuk, Special Agent
                                                    Drug Enforcement Administration

10

11

12  Subscribed and sworn before me on:  5/15/2017

13

14  Hon. Carolyn K. Delaney
15  U.S. MAGISTRATE JUDGE

16

17

18  Approved as to form by AUSA PAUL HEMESATH

19

20

21

22

23

24

25

26

27

28

**Attachment A**
**Property to Be Searched**

1. The cellular telephones assigned call number 916-291-0053, 916-549-8121, and 916-869-5828 (the "Target Cell Phones"), whose wireless service providers are AT&T and Sprint and Sprint respectively.

2. Information about the location of Target Cell Phones that is within the possession, custody, or control of AT&T and Sprint.

**Attachment B**
**Particular Things to be Seized**

All information about the location of the Target Cell Phones described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T and Sprint and Sprint. AT&T and Sprint and Sprint is required to disclose the Location Information to the government. In addition, AT&T and Sprint and Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T and Sprint and Sprint's services, including by initiating a signal to determine the location of the Target Cell Phones on AT&T's and Sprint's networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T and Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

SEALED

# United States District Court

| EASTERN | District of | CALIFORNIA |

In the Matter of the Search of                    **SEARCH WARRANT**

(Name, address or brief description of person, property or premises to be searched)      CASE NUMBER:

THE CELLULAR TELEPHONES ASSIGNED CALL
NUMBER 916-291-0053, 916-549-8121, and 916-869-5828.          **2:17 - SW - 0367   CKD**

TO, Maxim Lashchuk and any Authorized Officer of the United States

Affidavit(s) having been made before me by Maxim Lashchuk who has reason to believe

that ☐ on the person of, or ☒ on the premises known as (name, description and/or location)

   **SEE ATTACHMENT A, attached hereto and incorporated by reference**

in the _____EASTERN_____ District of _____CALIFORNIA_____ there
is now concealed a certain person or property, namely (describe the person or property to be seized)

   **SEE ATTACHMENT B, attached hereto and incorporated by reference**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described
is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

   YOU ARE HEREBY COMMANDED to search on or before _____5/29/2017_____
                                                                    Date
(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and making the
search ☐ in the daytime — 6:00 AM to 10:00 P.M. ☒ at any time in the day or night as I find reasonable cause has been
established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person
or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to
any authorized U.S. Magistrate Judge in the Eastern District of California, as required by law.
   U.S. Magistrate Judge (Rule 41(f)(4))

   ☒  I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)*  ☒ for ___30___ days *(not to exceed 30).*

                         ☐ until, the facts justifying, the later specific date of _____ .

_5/15/2017_ _10:38 am_ at   Sacramento, California
Date and Time Issued        City and State

_____
Carolyn K. Delaney, U.S. Magistrate Judge                    Signature of Judge

| RETURN | | Case Number: |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT RECEIVED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____      _____
Signature of Judge                            Date